## UNITED STATES BANKRUPTCY COURT FOR THE
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXTRACTION OIL & GAS, INC., *et al.*,[1] | ) | Case No. 20-11548 (CSS) |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| EXTRACTION OIL & GAS, INC. | ) | Adversary Proceeding |
| Plaintiff, | ) | Case No. 20-50839(CSS) |
| | ) | |
| v. | ) | |
| | ) | |
| ELEVATION MIDSTREAM, LLC | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Paul N. Heath (Del. No. 3704)
Amanda R. Steele (Del. No. 5530)
Travis J. Cuomo (Del. No. 6501)
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: heath@rlf.com
        steele@rlf.com
        cuomo@rlf.com


Dated: October 8, 2020

Marty L. Brimmage, Jr.
Admitted *pro hac vice*
Sarah Link Schultz
Admitted *pro hac vice*
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field St., Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: mbrimmage@akingump.com
        sschultz@akingump.com

*Counsel to the Special Committee of the
Board of Directors of Elevation Midstream,
LLC and to GSO EM Holdings LP*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Extraction Oil & Gas, Inc. (3923); 7N, LLC (4912); 8 North, LLC (0904); Axis Exploration, LLC (8170k); Extraction Finance Corp. (7117); Mountaintop Minerals, LLC (7256); Northwest Corridor Holdings, LLC (9353); Table Mountain Resources, LLC (5070); XOG Services, LLC (6915); and XTR Midstream, LLC (5624).  The location of the Debtors' principal place of business is 370 17th Street, Suite 5300, Denver, Colorado 80202.

Defendant Elevation Midstream, LLC ("*Elevation*") respectfully files its Proposed Findings of Fact and Conclusions of Law:

## PROCEDURAL HISTORY

1.      On August 10, 2020, in the main bankruptcy case, Debtor/Plaintiff Extraction Oil & Gas, Inc. ("*Extraction*"), along with the other above-captioned debtors and debtors-in-possession (the "*Debtors*"), filed their *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* (Case No. 20-11548, D.I. 377) (the "*Rejection Notice*"), concerning, in part, the three Gathering Agreements between Elevation and Extraction.[2]   On September 4, 2020, Extraction initiated this Adversary Proceeding against Elevation by filing its Complaint for Declaratory Judgment, seeking a declaration that the Gathering Agreements do not create covenants that run with the land.  *Complaint for Declaratory Judgment* (A. D.I. 1) ("*Complaint*"). The Court has jurisdiction over these jointly administered Chapter 11 cases and this adversary proceeding under 28 U.S.C. §§ 157 and 1334.  Under Section 157, this adversary proceeding is a core proceeding.

2.      On September 4, 2020, Extraction filed *Plaintiff's Motion for Summary Judgment* (A. D.I. 3) and *Brief in Support of Plaintiff's Motion for Summary Judgment* (A. D.I. 4) ("*Extraction MSJ*").  On September 10, 2020, Elevation filed the *Defendant's Motion for Summary*

---

[2] The three agreement collectively referred to herein as the "Gathering Agreements" include: (1) the Gas Gathering and Compression Agreement by and between Elevation Midstream, LLC and Extraction Oil & Gas, Inc., *Elevation MSJ* (A. D.I. 12-2), Ex. 1; (2) the Crude Oil Gathering and Stabilization Agreement by and between Elevation Midstream, LLC and Extraction Oil & Gas, Inc., *Elevation MSJ* (A. D.I. 12-3), Ex. 2; and (3) the Produced Water Gathering Agreement by and between Elevation Midstream, LLC and Extraction Oil & Gas, Inc., *Elevation MSJ* (A. D.I. 12-4), Ex. 3.  Each of the Gathering Agreements were amended by (a) the First Amendment to the Gas Gathering and Compression Agreement, Crude Oil Gathering and Stabilization Agreement and Produced Water Gathering Agreement *Elevation MSJ* (A. D.I. 12-5), Ex. 4; (b) Second Amendment to the Gas Gathering and Compression Agreement, Crude Oil Gathering and Stabilization Agreement and Produced Water Gathering Agreement, *Elevation MSJ* (A. D.I. 12-6), Ex. 5; and (c) the Third Amendment to the Gas Gathering and Compression Agreement, Crude Oil Gathering and Stabilization Agreement and Produced Water Gathering Agreement, *Elevation MSJ* (A. D.I. 12-7), Ex. 6.

*Judgment* (A. D. I. 11) and its *Brief in Support of Defendant's Cross-Motion for Summary Judgment* (A. D. I. 12) ("*Elevation Cross-MSJ*").   On September 23, 2020, Extraction filed *Plaintiff's Response in Opposition to Defendant's Cross-Motion for Summary Judgment* (A. D. I. 25) ("*Extraction Response*").   Also on September 23, 2020, Elevation filed *Defendant's Response to Plaintiff's Motion for Summary Judgment* (A. D. I. 26) ("*Elevation Response*").   On September 28, 2020, Elevation filed *Defendant's Reply Brief in Support of its Cross-Motion for Summary Judgment* (A. D. I. 29) ("*Elevation Reply*"), and Extraction filed *Plaintiff's Reply in Support of Plaintiff's Motion for Summary Judgment* (A. D. I. 30) ("*Extraction's Reply*").   The Court heard oral arguments on the summary-judgment motions on September 30, 2020.

## FINDINGS OF FACT

3.      Extraction and its affiliates are oil and gas companies, operating in the "upstream" oil and gas sector, focused on the acquisition, development and production of oil, natural gas and natural gas liquids reserves in the Colorado Rocky Mountain region.  *Declaration of Matthew R. Owens* ¶ 21 (D.I. 14).  Gathering, stabilization and compression facilities are needed for Extraction to process and deliver hydrocarbons and water, and Extraction "rel[ies] (and expect[s] to rely in the future) on facilities developed and owned by third parties in order to store, process, transmit and sell [its] oil and gas production."  *Elevation MSJ* (A. D. I. 12), Ex. 16 at 34.[3]

4.      Elevation provides "midstream" services to Extraction in the Broomfield and Southwest Wattenberg areas of Colorado.  *Declaration of Anindya Mishra*, *Elevation MSJ* (A. D.I. 12), Ex. A at ¶ 3.   These services involve the gathering, stabilization, and compression of hydrocarbons and produced water, to serve the development of Extraction's acreage in certain areas of Colorado.  *Id.*  Elevation (with Extraction's affiliate as its manager) designed and

---

[3] The Court takes judicial notice of the publicly available documents submitted with the *Elevation Cross-MSJ* and the *Elevation Response*.  FED. R. EVID. 201.

constructed the pipelines, infrastructure, equipment, fixtures, and improvements (the "Midstream Facilities") in Colorado necessary to provide services to Extraction in the Dedicated Area. *Elevation MSJ* (A. D.I. 12), Ex. A ¶ 21. The "Dedicated Area" includes the specific township and range locations in the Broomfield and Hawkeye areas identified in Exhibit C to the Gathering Agreements. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) §§ I(m), (uu), (qqq) and Ex. 2 at (Ex. A) §§ I(n), (rr), (ooo) and Ex. 3 at (Ex. A) §§ I(m), (pp), (lll). The Midstream Facilities were built in advance of Extraction fulfilling its drilling obligations and in anticipation of and in reliance on Extraction adhering to its obligations under the Gathering Agreements. *Id.*

5.      The Gathering Agreements are part of an investment made by GSO in 2018 after Extraction sought third-party investors to fund the costs to construct and install the Midstream Facilities in the Broomfield, Southwest Wattenberg, and Hawkeye areas of Colorado. *Elevation MSJ* (A. D.I. 12), Ex. A at ¶ 34. GSO's investment enabled Extraction to focus its capital dollars on the drilling and completion of wells, while using third-party capital (specifically, that of GSO) to fund the construction of the Midstream Facilities. *Elevation MSJ* (A. D.I. 12), Ex. A at ¶ 34. The Gathering Agreements, among other things, contained multiple covenants that were critical to GSO agreeing to invest in Elevation. *Elevation MSJ* (A. D.I. 12), Ex. A at ¶ 21.

6.      The Gathering Agreements are each governed by Colorado law. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XII and Ex. 2 at (Ex. A) § XII and Ex. 3 at (Ex. A) § XII. Each Gathering Agreement runs for a 15-year term, continuing year-to-year thereafter unless and until properly terminated. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at Art. VII and Ex. 2 at Art. VII and Ex. 3 at Art. VII.

7.      The Gathering Agreements require Elevation to design, construct, own, operate, and maintain the Midstream Facilities, including all related appurtenances and facilities, in order

to gather, stabilize, and compress Extraction's oil, gas, and produced water from the Dedicated

Interests. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 3.1 and Ex. 2 at § 3.1 and Ex. 3 at

§ 3.1. Pursuant to the Gathering Agreements, Elevation constructed the Midstream Facilities, and

commenced moving the crude oil, natural gas and water through certain of the Midstream Facilities

in October 2019. *Elevation MSJ* (A. D.I. 12), Ex. A at ¶¶ 3, 21. Without access to the Midstream

Facilities, there is no reasonably available alternative for Extraction to gather, compress, stabilize,

or transport the oil, gas, and water in the area, or market such hydrocarbons. *Elevation MSJ* (A.

D.I. 12), Ex. A at ¶ 28.

       8.     The Gathering Agreements are necessarily related to Extraction's oil and gas leases

in the Broomfield and Hawkeye areas of Colorado. *Elevation MSJ* (A. D.I. 12), Ex. A at ¶ 25.

Extraction's assets within the City of Broomfield are subject to myriad unique development

requirements and considerations, including Extraction's obligations to adhere to the terms and

conditions of the *Amended and Restated Oil and Gas Operator Agreement between Extraction and

the City and County of Broomfield, dated October 24, 2017* (the "Broomfield OA"), *Elevation

MSJ* (A. D.I. 12-16), Ex. 15.[4] Extraction is required to "utilize pipelines" under the Broomfield

OA. *Elevation MSJ* (A. D.I. 12-16), Ex. 15 at § 13. The locations of flowline and pipeline

easements may be changed only with the City's agreement. *Elevation MSJ* (A. D.I. 12-16), Ex.

15 at § 13. Further, the Broomfield OA sets forth the specific geographic locations where the

pipelines are to be built. *Elevation MSJ* (A. D.I. 12-16), Ex. 15 at Ex. E. That agreement also

includes an Easement Grant and Surface Use Agreement that the City entered into with Extraction

with respect to the pipeline facilities. *Elevation MSJ* (A. D.I. 12-16), Ex. 15 at Ex. F, Ex. H.

Extraction is granted a right to use the surface at designated locations. *Elevation MSJ* (A. D.I. 12-

---

[4]    *Available    at*    https://www.broomfield.org/DocumentCenter/View/25064/Resolution-2017-186-and-Agreement?bidId.

16), Ex. 15 at H.  The Broomfield OA requires Extraction to minimize trucking.  *Elevation MSJ* (A. D.I. 12-16), Ex. 15 at Ex. B.  Natural gas cannot be trucked and must be flowed in pipelines. *Elevation MSJ* (A. D.I. 12), Ex. A at ¶ 29.  Extraction has acknowledged to the City of Broomfield that the "design that involves pipelines and eliminates oil trucks and permanent tanks" provides "benefits to the City," specifically the City's land.  *June 15, 2018 Letter from Extraction to City County of Broomfield* (A. D.I. 12-18), Ex. 17.[5]

9.      Extraction also assigned to Elevation easements and rights-of-way, which Elevation utilized to lay its pipe and construct the Midstream Facilities.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XVI(d) and Ex. 2 at Ex. A § XVI(d) and Ex. 3 at (Ex. A) § XVI(d); *March 23, 2018 Assignment of Easement Interests* (A. D.I. 12-13), Ex. 12.

## CONCLUSIONS OF LAW

10.      Federal Rule of Civil Procedure 56, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, requires the Court to grant summary judgment when the moving party demonstrates that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief."  *Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.*, 298 F.3d 201, 210 n.12 (3d Cir. 2002).  The party moving for summary judgment bears the initial burden of making a prima facie showing of entitlement as to the relief sought.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  The burden then shifts to the non-moving party to "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (internal citation and quotation marks omitted).

---

[5] *Available at* https://www.broomfield.org/DocumentCenter/View/26964/Notice-of-Breach---June-15-2018?bidId=.

11.    In the *Extraction MSJ*, Extraction seeks summary judgment on its claim for declaratory judgment that the Gathering Agreements do not contain covenants running with the land, in order to seek to reject them pursuant to 11 U.S.C. § 365(a).  In the *Elevation Cross-MSJ*, Elevation seeks summary judgment that the Gathering Agreements contain covenants running with the land.

## I.    Colorado Law Applies A Two-Element Test For Creation Of Covenants Running With The Land, And Does Not Require Horizontal Privity of Estate.

12.    To determine whether a covenant is a real property covenant, the Court applies the law of the state where the real property is situated.  *See In re Brannon*, 476 F.3d 170, 176 (3d Cir. 2007) ("[W]e generally turn to state law for the determination of property rights in the assets of a bankrupt's estate." (quotations omitted)).  "Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 54 (1979).

13.    Here, the Gathering Agreements are governed by Colorado law.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XIII and Ex. 2 at (Ex. A) § XIII and Ex. 3 at (Ex. A) § XIII.  The real property at issue is located in the Dedicated Area in Colorado, along with the mineral interests, easements, leases, wells, and oil, gas, and water located therein and thereunder, as well as Elevation's Midstream Facilities.  *Elevation MSJ* (A. D.I. 12), Ex. A at ¶ 3.  Thus, Colorado law applies with respect to the creation of a property interest.

14.    Under Colorado law, a covenant concerning property may be real or personal.  *See Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. App. 2016).  Personal covenants are binding only on the actual parties to the covenant.  *Id.* at 440.  In contrast, real property covenants "run with the land and burden or benefit successors in interest." *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 75 (Colo. App. 1993); *see also Cloud v. Ass'n of Owners, Satellite Apt. Bldg., Inc.*, 857 P.2d 435, 440 (Colo. App. 1992).

15.    A real property covenant in Colorado is created based on two elements: (1) the intent of the parties to create a covenant that runs with the land and binds successors in interest; and (2) whether the covenant "touches and concerns" the land.  *Reishus*, 409 P.3d at 440; *Lookout Mountain*, 867 P.2d at 74; *Cloud*, 857 P.2d at 440.

16.    Extraction asserts that a third element of "horizontal" privity of estate must be satisfied in order to create a covenant under Colorado law.  Horizontal privity is the concept that a covenant is created in conjunction with a conveyance of an interest in property.  *Alta Mesa Hold'gs v. Kingfisher Midstream, LLC (In re Alta Mesa Res., Inc.)*, 613 B.R. 90, 106 (Bankr. S.D. Tex. 2019).  However, modern Colorado cases over the past 70 years do not articulate any privity of estate requirement in creating covenants running with the land.  *See Reishus*, 409 P.3d at 441 (listing only two elements of intent and touching and concerning the land, and not mentioning privity); *Lookout Mountain*, 867 P.2d at 74 (same); *Cloud*, 857 P.2d at 440 (same); *Banning Lewis Ranch Co. v. City of Co. Springs (In re Banning Lewis Ranch Co.)*, 532 B.R. 335, 345 n.11 (Bankr. D. Colo. 2015) (same).

17.    The cases cited by Extraction purporting to require horizontal privity under Colorado law do not support applying horizontal privity in this situation.  *See Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.*, 92 P. 290, 293 (Colo. 1907) (referencing "requisite privity of estate" without substantive analysis); *Hottell v. Farmers' Protective Ass'n*, 53 P. 327, 330 (Colo. 1898) (noting only that privity was "not denied"); *Fisk v. Cathcart*, 33 P. 1004, 1005 (Colo. App. 1893) (mentioning "privity" but providing no substantive discussion on the relevant analysis for covenants running with the land).  In *Taylor v. Melton*, 274 P.2d 977, 982 (Colo. 1954), the court found that privity was met between two successors to a deed with notice and knowledge of a restrictive covenant.  *Federal Deposit Insurance Corp. v. Mars*,

821 P.2d 826, 829 (Colo. App. 1991), does not apply any aspect of the traditional framework as to covenants running with the land—there is no mention of intent or touch and concern—and simply holds that privity of estate is met when an assignee is in possession. *Id.* None of the cases cited by Extraction have been relied on by Colorado courts to require a privity requirement.

18.    The Third Restatement of Property provides that "[n]o privity relationship between the parties is necessary to create a servitude." RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.4 (AM. LAW INST. 2000). Colorado courts have generally followed the Third Restatement when considering other issues concerning real property law. *See Lobato v. Taylor*, 71 P.3d 938, 950 (Colo. 2002) (applying Restatement (Third) of Property regarding creating easements); *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1235 (Colo. 1998) (applying Restatement (Third) of Property regarding creation of servitudes); *City of Steamboat Springs v. Johnson*, 252 P.3d 1142, 1147 (Colo. App. 2010) (quoting Restatement (Third) of Property: Servitudes § 1.3(1)). Further, "[m]odern legal writers unanimously favor the abolition of at least mutual and horizontal privity." 5 Richard R. Powell, The Law of Real Property ¶ 673[2][c], at 60-67. Privity was eliminated in the Restatement as a reflection of modern courts moving away from such a requirement. Molly Shaffer Van Houweling, *The New Servitudes*, 96 Geo. L.J. 885, 896-97 (2008) ("Criticism of the law's complexity and needless hostility to certain types of servitudes persisted [after the First Restatement], and over the course of the twentieth century courts in the United States gradually relaxed some of the most controversial limitations. Most jurisdictions no longer require horizontal privity . . . . This evolution is reflected in the recent *Restatement (Third) of Property: Servitudes* . . . ."). Courts have further observed that while it makes sense to require privity of estate between successors, "to go further and require that there must be some such succession between the covenanting parties themselves—that there must have been a grant or

conveyance between them at the time of the covenant or possibly some continuing interest of tenure, easement, or otherwise—is supported neither by ancient law nor by modern policy." *165 Broadway Bldg. v. City Investing Co.*, 120 F.2d 813, 816 (2d Cir. 1941).

19.     Accordingly, the Court finds that privity is not a required element under Colorado law to create a covenant running with the land between Extraction and Elevation.  However, as set forth below, even if privity is a required element under Colorado law, the Court also finds that privity is met under the Gathering Agreements.

## II.     The Covenants In The Gathering Agreements Run With The Land Under Colorado Law.

### A.     The intent of the parties to the Gathering Agreements was to create a covenant that runs with the land and bind all successors and assigns to those covenants.

20.     Extraction does not contest that the parties properly expressed their intent that the Gathering Agreements, and the covenants contained therein, run with the land.

21.     The Court finds that the Gathering Agreements clearly state that the parties intended to create covenants running with the land, create real property interests and servitudes, and bind their successors and assigns.

22.     Express contract language identifying a covenant as one running with the land is the most straightforward indication of intent under Colorado law.  *See Reishus* 409 P.3d at 441 (noting intent was clear where the contract "explicitly state[d] that '[t]he provisions of this Agreement shall run with the Ranch, shall be binding upon and inure to the benefit of all Owners, their legal representatives, heirs, successors and assigns, and shall be in effect in perpetuity unless amended or terminated'"); *Cloud*, 857 P.2d at 440 (express language in covenant was dispositive of intent).

23.     The intent of the parties is clear in the contract language that the Gathering Agreements, and the covenants and servitudes contained therein, run with the land.

First, Section 2.4 of each Gathering Agreement, which is entitled "Covenant Running with the Land," provides:

> The Dedication and the Delivery Obligation, the grant of servitude hereinafter provided and other Property Rights and Producer's covenants under Section 2.3, together with all other related commitments in this Agreement and the matters set forth in GTC Section XV(a), GTC Section XV(b) and GTC Section XV(c) are not merely contract rights but are **covenants running with (and touching and concerning) all of the Dedicated Interests (including the underlying [Gas/Crude Oil/Water], lands, leases and wells)** and, in addition, are **binding upon the successors and assigns** of Dedicated Interests and/or Producer's [Gas/Crude Oil/Water]. Producer acknowledges and agrees that the Dedication and Delivery Obligation made hereunder **assigns and conveys to Elevation a servitude** in the nature of a real covenant which touches and concerns the Dedicated Interests and are for the benefit of Elevation and its successors and permitted assigns, without which, Elevation would be unwilling to enter into or perform under this Agreement.

*Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.4 (emphases added) and Ex. 2 at § 2.4 (emphases added) and Ex. 3 at § 2.4 (emphases added). As defined below, the Dedication and Delivery Obligation committed and dedicated the underlying crude oil, gas, water, lands, leases, easements, mineral interests, and wells. This provision unambiguously confirms the parties' intent to create real property covenants that run with the land.

24.     Intent may also "be inferred from the acts and conduct of the [parties]," which is shown here as well. *Lookout Mountain*, 867 P.2d at 74-75; *see also Banning Lewis Ranch*, 532 B.R. 335, 345 n.11 (Bankr. D. Colo. 2015) (finding contracts contained covenants that run with the land because they were binding on successor in interest and "[o]ther [a]greements contain similar indications of the parties' intent to create covenants that run with the land ... [and] 'closely relate to the land, its use, or its enjoyment'" (quoting *Cloud*, 857 P.2d at 440)). Pursuant to Section 9.3 of the Gathering Agreements, the parties executed and publicly recorded a *Memorandum of Agreement* (each, a "Memorandum" and collectively, the "Memoranda") for each Gathering Agreement in each of the eight counties and two cities encompassing the Dedicated Area.

*Elevation MSJ* (A. D.I. 12-8), Ex. 7; *Elevation MSJ* (A. D.I. 12-9), Ex. 8; *Elevation MSJ* (A. D.I. 12-10), Ex. 9; *see Alta Mesa*, 613 B.R. at 106 ("Provisions that require recording of the agreement also support a finding that the parties intended the covenant to run with the land."). The Memoranda each state that the parties "acknowledge and agree that the dedication made under the [Gathering Agreements] . . ., and the servitudes therein and herein, assigns and conveys to Elevation a servitude in the nature of a real covenant which touches and concerns the Dedicated Interests and are for the benefit of Elevation and its successors and permitted assigns." *Elevation MSJ* (A. D.I. 12-8, 12-9, 12-10), Ex. 7 at p.1 and Ex. 8 at p.1 and *Elevation MSJ* (A. D.I. 12-10), Ex. 9 at p.1. Other provisions of the Gathering Agreements—including Sections 2.1, 2.3(a), and Exhibit A, § XII—as well as the Ratification Agreement executed by Elevation and Extraction (along with Debtors 8 North, LLC and Axis International, LLC) further confirm the parties' intent to bind successors and assigns under the Gathering Agreements, and that the Gathering Agreements, and the covenants therein, run with the land as well. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at §§ 2.1, 2.3(a), (Ex. A) § XII and Ex. 2 at §§ 2.1, 2.3(a), (Ex. A) § XII and Ex. 3 at §§ 2.1, 2.3(a), (Ex. A) § XII; *Elevation MSJ* (A. D.I. 12-11), Ex. 10 at § 2.

25.    Accordingly, the Court finds that the parties intended to bind successors and assigns and form covenants running with the land, the Dedicated Interests, in the Gathering Agreements.

**B.    The covenants in the Gathering Agreements touch and concern the land.**

26.    The second element of the analysis is whether the covenants touch and concern the land. *See Reishus*, 409 P.3d at 440. "A covenant touches and concerns the land if it closely relates to the land, its use, or its enjoyment." *Id.* (quotation omitted). Colorado, like most jurisdictions, applies a benefits and burdens analysis. *See Cloud*, 857 P.2d at 440-41; *Bigelow v. Nottingham*, 833 P.2d 764, 767 (Colo. App. 1991), *rev'd in part on other grounds*, *Harbel v. Bigelow*, 855 P.2d 1368 (Colo. 1993) ("'[T]ouch and concern' requirement is fulfilled when the covenant operates to

benefit the physical use of the land." (internal citation omitted)).  Similarly, recent Bankruptcy Court decisions applying law from other producing-state jurisdictions, under substantially identical circumstances, have also focused on the benefits and burdens to the underlying real property interest.  *See Alta Mesa*, 613 B.R. 90; *Monarch Midstream, LLC v. Badlands Prod. Co. (In re Badlands Energy, Inc.)*, 608 B.R. 854 (Bankr. D. Colo. 2019); *Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 223 (5th Cir. 2013).  These cases are instructive.

27.    Numerous covenants in the Gathering Agreements are closely related to, and therefore touch and concern, "the Dedicated Interests."  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.4 and Ex. 2 at § 2.4 and Ex. 3 at § 2.4.  "Dedicated Interests" is defined to include Extraction's and its affiliates' held and after-acquired interests in "lands, mineral interests, easements, leases, wells, and [gas, oil, and water] therein and thereunder."  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § I(vv) and Ex. 2 at (Ex. A) § I(ss) and Ex. 3 at (Ex. A) § I(qq).  The benefits and burdens imposed on the Dedicated Interests make clear that the Gathering Agreements, and the covenants contained therein, run with the land.

### 1. Extraction admits that the Drilling Commitment in the Gathering Agreements touches and concerns the land.

28.    Extraction admits that each Gathering Agreement contains a critical covenant that touches and concerns the land—the Drilling Commitment.  *Complaint* (A. D.I 2) at ¶¶ 29, 48, 57, 66; *Extraction MSJ* (A. D.I. 4) at 12 n.12.  This covenant—Exhibit A, Section XV(c) and Exhibit F of each Gathering Agreement— requires Extraction to drill, complete and equip a defined number of wells in the Dedicated Area by the end of 2022.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XV(c), (Ex. F) and Ex. 2 at (Ex. A) § XV(c), (Ex. F) and Ex. 3 at (Ex. A) § XV(c), (Ex. F).  The Drilling Commitment touches and concerns the land.

29.     The Drilling Commitment is a critical and integral covenant in each Gathering Agreement.    Substantially all of Elevation's income is dependent on Extraction's continued hydrocarbon production from actively drilling in the Dedicated Area.  *Elevation MSJ* (A. D.I. 12-1), Ex. A at ¶ 20.  The Drilling Commitment cannot be separated from other covenants in the Gathering Agreements.  The fact that Extraction was required to drill a set number of wells by 2022 underlies the entirety of the Dedication and Delivery Obligation covenants and the parties' consideration for entering into such agreements.

30.     The Drilling Commitment is closely related to the use and enjoyment of Extraction's mineral interests and leases, including concerning the required implied covenants under Colorado law on producers "to drill," "to develop after discovery of oil and gas in paying quantities" and "to operate diligently and prudently."  *Garman v. Conoco, Inc.*, 886 P.2d 652, 659 (Colo. 1994); *see also Davis v. Cramer*, 808 P.2d 358, 361 (Colo. 1991) (implied covenant to operate diligently and prudently includes "implied covenant to market").  The Court concludes that the Drilling Commitment on its own is sufficient to establish that the Gathering Agreements run with the land.

31.     Extraction incorrectly asserts that the Court must perform an isolated covenant-by-covenant review.  A contract may run with the land as a whole even where certain covenants do not.  *See Cloud*, 857 P.2d at 440–41 (covenant that would constitute a personal covenant standing alone was held to run with the land where it was integrally connected with another real property covenant); *Reishus*, 409 P.3d at 441 (finding agreement as a whole ran with the land even where one provision was a personal covenant standing alone); *Lookout Mountain*, 867 P.2d at 75 (holding one obligation in a covenant requiring owners to submit plans for approval to the homeowners' association was "an integral part of the whole contract" such that the entire covenant ran with the

land).  *MidCities Metropolitan District No. 1 v. U.S. Bank National Association*, which Extraction cites, held that a covenant did not apply to the grantee's successor because it was never intended to as endorsing a stand-alone review of covenants.  No. 12-cv-03322-LTC, 2013 WL 3200088, at *4-6 (D. Colo. 2013).  That covenant was the only one at issue in the case.  *Id.  MidCities* provides no support to find that the Gathering Agreements, and the covenants therein, do not run with the land.

32.    The Drilling Commitment acts as a limitation on Extraction's reservation under Section 2.2 as to the drilling and operating of wells.  Section 2.2 is expressly subject to the terms of the Drilling Commitment.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-5), Ex. 1 at § 2.2(d) and Ex. 2 at § 2.2(b) and Ex. 3 at § 2.2(b).

33.    The Drilling Commitment is a critical and integral component of each Gathering Agreement and was part of the entire agreement to construct and operate the Midstream Facilities.  *Elevation MSJ* (Doc. 12-1), Ex. A at ¶ 22.  The Drilling Commitment cannot be separated from the other covenants in the Gathering Agreements.  The Court concludes that it is sufficient here that the Drilling Commitment touch and concern the land for the Gathering Agreements as a whole, and the covenants therein, to run with the land.

### 2. Extraction dedicated interests under the Gathering Agreements closely affecting the use and enjoyment of the land.

#### a. The Dedication and Delivery Obligation under Section 2.1, as confirmed under other documents, touch and concern the land.

34.    The Court also finds that multiple other covenants run with the land.  Section 2.1 of the Gathering Agreements contains the "Dedication," by which Extraction, on its own and its Affiliates' behalf, "commits and dedicates the Dedicated Interests (whether now owned or hereafter acquired) and the exclusive right to receive from [Extraction] and its Affiliates at the Delivery Points all [oil, gas, and water] *therein and thereunder* and as may be produced therefrom

to the performance of this Agreement." *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.1 (emphasis added), Ex. 2 at § 2.1 (emphasis added), Ex. 3 at § 2.1 (emphasis added). The "Dedicated Interests" include Extraction's and/or its Affiliates' held and after-acquired "interests … in lands, mineral interests, easements, leases, wells and [Gas, Crude Oil, and Water], *therein and thereunder*" to the extent not already dedicated or committed. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § I(vv) (emphasis added), Ex. 2 at (Ex. A) § I(ss) (emphasis added), Ex. 3 at (Ex. A) § I(qq) (emphasis added). The Dedication is robust and enshrines a broad commitment and dedication of Extraction's real property interests, including its interests in oil and gas leases and other mineral interests and of all volumes "therein and thereunder" (including minerals and hydrocarbons under the ground) from the Dedicated Area.

35.    In the Memoranda, Extraction confirmed that it "dedicated and committed, and hereby [under the Memoranda] dedicate and commit, to Elevation . . . the Dedicated Interests (whether now owned or hereafter acquired) and the exclusive right to receive from [Extraction] and its Affiliates all [Gas, Crude Oil, and Water] produced from the Dedicated Interests and the Other Interests . . . within the dedicated area . . . ." *Elevation MSJ* (A. D.I. 12-8, 12-9, 12-10), Ex. 7 at p.1, Ex. 8 at p.1, Ex. 9 at p.1.

36.    Extraction also provided a "Delivery Obligation" in Section 2.1 that touches and concerns the land. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.1 and Ex. 2 at § 2.1 and Ex. 3 at § 2.1. Under the Delivery Obligation, Extraction agreed, on its behalf and on behalf of its Affiliates, to "connect all of [Extraction's] wells within the Dedicated Area to the [Midstream Facilities] and deliver to Elevation at the Delivery Points one hundred percent (100%) of the [crude oil, gas, and water] produced from the Dedicated Interests and from the Other Interests." *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.1 and Ex. 2 at § 2.1 and Ex. 3 at § 2.1.

37.     Extraction argues that the Dedication only "identif[ies] the parties' contractual rights and obligations" and does not grant Elevation an interest in the oil, gas, and water in place. *Extraction MSJ* at p.15 and p.18.  A dedication is a commitment in which all hydrocarbons or minerals (whether above or below ground) from certain identified real property interests—either certain identified oil and gas leases or interests or from within a certain specifically described geographic area—are committed to a certain midstream company for the provision of certain identified services or for purchase.  In order to determine whether and to what extent a producer is dedicating and committing real covenants, the Court must closely analyze the terms of the underlying agreement, including what real property interests are owned and dedicated by the producer.  The plain language of the Dedication establishes that the parties intended a broad commitment.  The Dedication in the Gathering Agreements involves Extraction granting and committing to Elevation part of its own underlying property rights in the lands, mineral interests, easements, leases, wells and gas, oil, and water therein and thereunder—all quintessential real property interests.  *See Greenshields v. Warren Petroleum Corp.*, 248 F.2d 61, 68-69 (10th Cir. 1957); *Warrior Gas Co. v. Valero Hydrocarbons, L.P.*, 04-95-00825-CV, 1996 WL 512035, at \*2-3 (Tex. App. 1996).

38.     The Dedication, as well as the Delivery Obligation, encompasses the granting of real property interests to Elevation.  In Colorado, "an oil and gas lessee has an interest in real property." *Maralex Resources, Inc. v. Chamberlain*, 320 P.3d 399, 403 (Colo. App. 2014).  The inclusion of the oil, gas, and water "therein and thereunder" in the Dedication, and the obligation to deliver all of the produced oil, gas, and water under the Delivery Obligation, caused Extraction to relinquish to Elevation part of its real property rights under its oil and gas lease, including the right to transport the hydrocarbons over the surface. *See Garman*, 886 P.2d at 654 ("Transportation

is required when gas is moved from the wellhead to a central location to prepare it for transmission and consumption, commonly referred to as gathering."); *see also Alta Mesa*, 613 B.R. at 103–04 (where producer dedicated nearly all of its production to the midstream company, it burdened its interests under the mineral leases by restricting its right to seek a different gatherer or build its own gathering system); *Badlands Energy*, 608 B.R. at 869 (finding dedication of reserves "in and under" the land was a dedication of a real property interest because under Utah law "'real property' includes non-extracted minerals"). Accordingly, the Dedication and Delivery Obligation burden Extraction's real property interests and closely relate to the use and enjoyment of its mineral interests.

39.    Extraction focuses on the nature of produced hydrocarbons as personal, citing to *In re Sabine Oil & Gas Corp.*, 547 B.R. 59, 66 (Bankr. S.D.N.Y. 2016). But the personal nature of produced hydrocarbons does not prevent the Dedication or Delivery Obligation from touching and concerning the land. The dedication in *Sabine* applied only to "produced and saved" hydrocarbons, and "concern[ed] only minerals extracted from the ground." *Id.* In contrast, the Gathering Agreements here dedicate the lands, mineral interests, easements, leases, wells, and oil, gas, and water "therein and thereunder" under the definition of "Dedicated Interests." *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.1, (Ex. A) § I(vv) and Ex. 2 at § 2.1, (Ex. A) § I(ss) and Ex. 3 at § 2.1, (Ex. A) § I(qq). For such contracts, the ultimate treatment of produced hydrocarbons as personal property does not alter the test. *See Badlands Energy*, 608 B.R. at 869 ("The Court is not persuaded the Agreements cannot be said to touch-and-concern the land simply because one of the objectives of the Agreements is indeed the gathering, processing and disposal of 'produced gas' and water, which are not real property interests."). "The question is not *what* is conveyed by the covenant, but viewed in the context of its purpose, does the performance or

nonperformance of it affect the use, value or enjoyment of the land itself." *Id.* (emphasis in original).

40.    The Dedication and the Delivery Obligation closely relate to the Dedicated Interests and therefore touch and concern the land.

### b. Other provisions in the Gathering Agreements also burden Extraction's mineral interests.

41.    Further, Exhibit A, Section XV(a) of each Gathering Agreements requires that so long as Preferred Units are outstanding, Extraction "covenants to, and agrees with, [GSO] to comply with, and to cause each of [Extraction's] Contracting Party Affiliates to comply with, the covenants, agreements, and other provisions of Sections 6.6(a) and 6.6(b) of the LLC Agreement." *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XV(a) and Ex. 2 at (Ex. A) § XV(a) and Ex. 3 at (Ex. A) § XV(a).    Section 6.6(a) of the LLC Agreement requires Extraction to exclusively use Elevation and Elevation's subsidiaries for all of Extraction's oil, gas, and produced water midstream operations within the Dedicated Area.    *Elevation MSJ* (A. D.I. 12-12), Ex. 11 at § 6.6.

42.    This covenant touches and concerns the land by requiring Extraction to *exclusively* use Elevation's midstream services in the gathering of Extraction's hydrocarbons in the Dedicated Area.    Gathering is part of the implied covenant to market under Colorado law.    *See Garman*, 886 P.2d at 654.    Exhibit A, Section XV(a) of each Gathering Agreement provides that Elevation is entitled to specific performance to enforce this covenant.    *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XV(a) and Ex. 2 at (Ex. A) § XV(a) and Ex. 3 at (Ex. A) § XV(a). This covenant precludes Extraction from simply transferring its services to another gatherer and providing Elevation with a damages claim.    Extraction has agreed that there would be "irreparable damages, for which monetary damages, even if available, would not be an adequate remedy" if it

used another gatherer in the Dedicated Area. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XV(a) and Ex. 2 at (Ex. A) § XV(a) and Ex. 3 at (Ex. A) § XV(a).

43.     Section 2.8 of the Gathering Agreements also demonstrates that the covenants touch and concern the land.  That provision requires Extraction to execute, and cause its affiliates owning any Dedicated Interests to execute, the Ratification Agreement.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.8 and Ex. 2 at § 2.8 and Ex. 3 at § 2.8.  Extraction, 8 North, and Axis all executed the Ratification Agreement as Ratifying Parties.  *Elevation MSJ* (A. D.I. 12-11), Ex. 10.  Under the Ratification Agreement, those "Ratifying Parties" "ratif[ied] and confirm[ed] the dedication of all of their interests in (i) the Dedicated Interests and other Property Rights and Other Interests and (ii) the dedicated Gas, Crude Oil and Water, as the case may be . . . to Elevation and to the performance of the [Gathering] Agreements . . . ."  *Elevation MSJ* (A. D.I. 12-11), Ex. 10 at § 2(a).  Further, Section 2(b) of the Ratification Agreement confirmed that the Dedication, the Delivery Obligation, the grant of servitude, the other Property Rights, and the covenants and related commitments in the Gathering Agreements (including under Exhibit A, Section XV), were not merely contract rights but are "covenants running with (and touching and concerning) all of the Dedicated Interests (including the underlying Gas, Crude Oil, Water, lands, leases and wells) . . . ."  *Elevation MSJ* (A. D.I. 12-11), Ex. 10 at § 2(b).

44.     Section 2.4 of the Gathering Agreements also reinforces that the Dedication and the Delivery Obligation, the grant of servitudes, the other Property Rights, the covenants under Section 2.3, the other related commitments, and the matters in Exhibit A, Section XV (as discussed above) are covenants that touch and concern all of the Dedicated Interests, including the underlying gas, crude oil, and water, as well as the lands, mineral interests, easements, leases, and wells. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.4 and Ex. 2 at § 2.4 and Ex. 3 at § 2.4.  Section 2.4

also confirms that a servitude was "assign[ed] and convey[ed]" to Extraction.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.4 and Ex. 2 at § 2.4 and Ex. 3 at § 2.4; *see City of Steamboat Springs*, 252 P.3d at 1147 ("A servitude is simply a covenant that 'runs with the land.'").

### c. Extraction's actions and admissions confirm that the Gathering Agreements touch and concern the land.

45.     Extraction's actions confirm that the Gathering Agreements touch and concern the land.  Extraction sought GSO's approval pursuant to Section 2.3 of the Gathering Agreements to release certain Dedicated Interests from the valid dedications at issue in connection with Extraction's consummation of acreage swaps wherein new leasehold interests were acquired from a third party in exchange for existing, burdened leasehold interests (and thereafter dedicated pursuant to the after-acquired dedication language).  *Elevation MSJ* (A. D.I. 12-14), Ex. 13; *Elevation MSJ* (A. D.I. 12-15), Ex. 14.  Such a release would not have been necessary if Extraction's obligations under the Gathering Agreements were personal obligations and did not attach to and run with the underlying real property interests.

46.     In addition, Extraction's admissions in the Verified Complaint it filed against the City and County of Broomfield on September 14, 2020 in the United States District Court for the District of Colorado further confirms that the covenants in the Gathering Agreements touch and concern the land.  *Elevation MSJ* (A. D.I. 26-1), Ex. 18.  First, Extraction admitted that, pursuant to the Broomfield OA, it "has entered burdensome contractual commitments in order to cause the construction of an approximate $240 million pipeline system and central gathering facility so oil and gas from the wells can be produced into a closed-loop system without permanent tanks and processed miles away from Broomfield in rural Weld County, minimizing the Project's footprint, environmental impact, and noise."  *Elevation MSJ* (A. D.I. 26-1), Ex. 18 at ¶ 48.  Extraction further admitted in its Complaint that the "pipeline system was built solely to support" Extraction's

drilling in Broomfield. *Elevation MSJ* (A. D.I. 26-1), Ex. 18 at ¶ 110. These admissions by Extraction demonstrate that the Gathering Agreements are closely related to Extraction's use and enjoyment of its mineral interests in Broomfield in terms of both burdening and benefitting what Extraction is able to accomplish when extracting the oil and gas from the ground. The Gathering Agreements and the covenants therein, therefore, closely relate to the use and enjoyment of the land by minimizing the footprint and the environmental impact of Extraction's use of its leases.

> **d.  The connections between the Gathering Agreements and the Broomfield OA further confirm that the Gathering Agreements closely relate to the use and enjoyment of the land.**

47.     The Gathering Agreements significantly benefit and burden Extraction's underlying oil and gas leasehold interests by providing Extraction, through the Midstream Facilities, a reliable and permanent means of gathering, transporting, and otherwise servicing the oil and gas all the way to market, and redelivering the associated produced water while meeting stringent regulatory standards set by the City and County of Broomfield. In this manner, the covenants in the Gathering Agreements are closely related and interconnected with the Broomfield OA, which governs Extraction's operations as to the oil and gas leases. The Broomfield OA expressly requires Extraction to "utilize pipelines." *Elevation MSJ* (A. D.I. 12-16), Ex. 15 at § 13. The best management practices described in the Broomfield OA further require that Extraction "agrees to build pipelines for the transport of oil, gas and produced water" and include substantial restrictions on any potential trucking activity. *Elevation MSJ* (A. D.I. 12-16), Ex.  15 at (Ex. B) § 3. In permitting Extraction's exploration and development activities, the Broomfield OA demanded an infrastructure of the exact type and in the exact locations as provided by the Midstream Facilities and, now that the Midstream Facilities are built, the Gathering Agreements and the Broomfield OA are inextricably integrated. Extraction cannot adhere to its Broomfield

OA obligations in connection with its development of the oil and gas leasehold interests without Elevation performing its obligations under the Gathering Agreements.

### 3. The easements and rights-of-way granted to Elevation under the Gathering Agreements also affect the use and enjoyment of the land.

48.     Extraction also granted to Elevation easements and rights-of-way upon the Dedicated Area "for the purpose of constructing, operating, repairing, replacing, maintaining, and removing measurement facilities." *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XVI(d) and Ex. 2 at (Ex. A) § XVI(d) and Ex. 3 at (Ex. A) § XVI(d).  The parties intended servitudes such as the easements, as well as all related commitments, to run with the land pursuant to Section 2.4 of the Gathering Agreements.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.4 and Ex. 2 at § 2.4 and Ex. 3 at § 2.4.

49.     Elevation relied upon the easements granted to it by Extraction on numerous occasions to lay many miles of midstream infrastructure and pipe and otherwise connect the Midstream Facilities to Extraction's well sites, relying wholly upon Extraction's underlying leasehold interest, its access rights arising thereunder, and the grant of easements contained in the Gathering Agreements.  *Elevation MSJ* (A. D.I. 12-1), Ex. A at ¶ 23.  In several instances, pipelines have been installed on Extraction's leasehold interest that are part of Elevation's Midstream Facilities.  *Id.*

50.     The easements and rights-of-way granted to Elevation touch and concern the land, including because they encumber and are closely related to Extraction's Dedicated Interests, including the lands, mineral interests, easements, leases, wells, and oil and gas leases, and result in both benefits and burdens as between the covenants and the oil and gas leases.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § I(vv) and Ex. 2 at (Ex. A) § I(ss) and Ex. 3 at (Ex. A) § I(qq).  Extraction's grants of easements and rights-of-way to Elevation provide Elevation with

co-extensive rights to use those areas in order to construct, operate, and maintain the Midstream

Facilities, including the pipelines that Extraction is required to use under the Broomfield OA.

51.     Easements are interpreted in the same manner as any other contract creating a

servitude. *See Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1235 (Colo. 1998); *City

of Steamboat Springs*, 252 P.3d at 1147 (acknowledging an easement is a servitude). "[T]he

language used in creating a servitude ordinarily should be interpreted to accord with the meaning

an ordinary purchaser would ascribe to it in the context of the parcels of land involved." *Id.*

(quoting RESTATEMENT (THIRD) OF PROPERTY § 4.1, cmt. c (AM. LAW INST. Tentative Draft No. 4

1994)). The language in the Gathering Agreements is clear that Extraction "assigns and conveys

to Elevation a servitude" (including the easements and rights-of-way) "in the nature of a real

covenant which touches and concerns the Dedicated Interests and for the benefit of Elevation and

its successors and permitted assigns." *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.4 and

Ex. 2 at § 2.4 and Ex. 3 at § 2.4.   "[A] servitude should be interpreted to give effect to and be

consistent with the intentions of the parties to an expressly created servitude." *Lazy Dog Ranch*,

956 P.2d at 1235 (quoting RESTATEMENT (THIRD) OF PROPERTY § 4.1(1)(a), cmt. c (AM. LAW INST.

Tentative Draft No. 4 1994)). The intent of the parties here was to create a servitude that touches

and concerns the land.

52.     Easements are interests in real property under Colorado law. *See Wright v. Horse

Creek Ranches*, 697 P.2d 384, 387 (Colo. 1985) ("An easement is an interest in property which,

though distinct from an ownership interest in the land itself, nevertheless confers upon the holder

of the easement an enforceable right to use property of another for specific purposes."); *Strole v.

Guymon*, 37 P.3d 529, 533 (Colo. App. 2001) (noting easements are "a privilege existing distinct

from the ownership of the land itself; nevertheless it is an interest in land"). Colorado oil and gas

leases include the right to use the surface land as necessary for operation.  *See Notch Mountain Corp. v. Elliott*, 898 P.2d 550, 557 (Colo. 1995) ("[S]evered minerals cannot be developed absent access to the surface estate."); *Frankfurt Oil Co. v. Abrams*, 413 P.2d 190, 194 (Colo. 1966) ("[A] mineral lessee has a right to use so much of the surface as may be reasonably necessary for operation.").

53.     The granting of easements in the Gathering Agreements to the midstream company "reduces [the producer's] real property interest under the leases . . . and directly burden[s] [the producer's] interest in the reserves because they restrict [the producer's] use of the surface land for drilling or exploration."  *Alta Mesa*, 613 B.R. at 104; *see also id.* ("[I]n the context of an oil and gas lease, the surface easement is integral to the lessee's ability to realize the value of its mineral reserves.   Without the surface easement, the lessee cannot capture reserve hydrocarbons."); *Badlands Energy*, 608 B.R. at 874 (finding easement grant to midstream company constitutes conveyance that burdens the underlying real property interest).

54.     By granting the easements and rights-of-way across the lands in the Dedicated Area to install and maintain the Midstream Facilities, Extraction burdened, and granted an interest in, the underlying leasehold and other property interests, including its rights to lay pipeline under the terms of its oil and gas leases or that were granted in accordance with the Broomfield OA. *Elevation MSJ* (A. D.I. 12-16), Ex. 15 at (Ex. F) at p.1, ¶ 13; *see also Badlands Energy*, 608 B.R. at 874 ("Moreover, the [gathering contract] granted [the gatherer] a floating easement across the Leases and lands in which Producer may have an interest. . . .  [T]he easement and Dedication are conveyances that simultaneously burden the same real property interest."); *Alta Mesa*, 613 B.R. at 105 (finding easement granted to gatherer "integrally tied to the purpose of an oil and gas lease."). Gatherers like Elevation that are granted easements to install and maintain gathering equipment

have "some interest in the leasehold binding on the assignee thereof with notice." *Sw. Pipe Line*

*Co. v. Empire Nat. Gas Co.*, 33 F.2d 248, 252 (8th Cir. 1929); *see also Greenshields*, 248 F.2d at

70 ("Where, as here, the owner of an oil and gas lease contracts for the sale of oil and gas from the

wells thereon, giving the vendee the right to go upon the land and place the necessary structures

to connect the well with its pipe line an interest in the leasehold is thus granted.").

55.     The easements, rights-of-way and other rights granted to Elevation burden

Extraction's real property interests in the Dedicated Interests (including the oil and gas leases),

closely affect Extraction's use and enjoyment of the Dedicated Interests, and, therefore, touch and

concern the land.

**4.  Any assignee of Extraction's working interest or oil and gas leases is expressly subject to the Dedications under the Gathering Agreements, which closely affects the use and enjoyment of the land.**

56.     The assignment provisions in the Gathering Agreements, which are also related

commitments, also closely affect the use and enjoyment of Extraction's real property interests.

Section 2.3 of the Gathering Agreements provides that any sale, assignment or pledge of all or any

portion of the Dedicated Interests will be made expressly subject to the Gathering Agreements.

*Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.3 and Ex. 2 at § 2.3 and Ex. 3 at § 2.3.

Section XII of the General Terms and Conditions further requires that the Gathering Agreements

"will be binding upon and inure to the benefit of the Parties and their respective successors and

assigns" and "may not be transferred or assigned, in whole or in part, by either Party without the

prior written consent of the other Party." *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex.

A) § XII and Ex. 2 at (Ex. A) § XII and Ex. 3 at (Ex. A) § XII.  Any assignee is required to ratify

the Gathering Agreements and assume the obligations of the assigning Party. *Id.*

57.     Without these assignment restrictions, Extraction would have a fully transferrable

right in the property with no notice of the Gathering Agreements to any third parties. Instead,

Extraction is expressly prohibited from making full use of its oil and gas interests within the Dedicated Area, about which third parties are on notice because the twenty-four Memoranda were properly recorded. *Elevation MSJ* (A. D.I. 12-8, 12-9, 12-10), Ex. 7 and Ex. 8 and Ex. 9. Such an assignment restriction closely relates to the land. *In re Energytec*, 739 F.3d at 224 (finding assignment restriction "impact[s] the owner's interest in the pipeline" and "the pipeline's value in the eyes of prospective buyers").

### 5. The Article III covenants further directly affect the use and enjoyment of Extraction's mineral estate.

58. The requirement for Elevation to provide and construct the Midstream Facilities for the purpose of Extraction producing and transporting its hydrocarbons to market further closely affects Extraction's use and enjoyment of the Dedicated Interests. Article III of each Gathering Agreement required Elevation to timely plan, construct and maintain the critical midstream infrastructure within the Dedicated Area in order to facilitate Extraction's oil and gas development.

59. Section 3.1 requires Elevation to "design, construct, own, operate, and maintain" the Midstream Facilities, and the Initial Delivery Points in order to gather, compress and/or stabilize Extraction's crude oil, gas, and water from the Dedicated Interests. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 3.1 and Ex. 2 at § 3.1 and Ex. 3 at § 3.1. Elevation is also required under Section 3.2 to deliver to the required facility, as applicable, condensate, gas, and water attributable to Extraction's crude oil, gas, and water. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 3.2 and Ex. 2 at § 3.2 and Ex. 3 at § 3.2. Section 3.3 requires Elevation to commence and complete with due diligence the installation of subsequent pipeline and other facilities necessary to enable Elevation to receive deliveries of crude oil, gas, and water, and Section 3.4 grants Elevation the right to elect to construct New Delivery Points outside the Dedicated Area.

*Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at §§ 3.3, 3.4 and Ex. 2 at §§ 3.3, 3.4 and Ex. 3 at §§ 3.3, 3.4.

60.     These requirements placed on Elevation were necessary to facilitate the production of gas, crude oil, and water by Extraction.   Elevation did, in fact, lay pipeline and install the Midstream Facilities in compliance with its obligations under the Gathering Agreements, in reliance on the fact that it acquired an interest in the Dedicated Area, the Drilling Commitment, and the enforceability of the Gathering Agreements as covenants running with the land.   *Elevation MSJ* (Ex. 12-1), Ex. A at ¶¶ 21, 23.   By requiring installation of the Midstream Facilities, the Article III provisions facilitate the extraction of all gas, crude oil, and water in the Dedicated Area (which would otherwise not be marketable), and increase the value of the underlying real property by providing a thorough, reliable and efficient midstream solution.   Thus, these provisions further closely relate to the Dedicated Interests and touch and concern the land.

### 6.   The fixed fee provision in the Gathering Agreements both benefit and burden Extraction's real property interests.

61.     Finally, the fixed fee requirement under Section 4.3(a) of each Gathering Agreement also touches and concerns the land.   *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 4.3(a) and Ex. 2 at § 4.3(a) and Ex. 3 at § 4.3(a).   Fixed fees are required as compensation to Elevation under the Gathering Agreements for the oil, gas, and water gathered, compressed and/or stabilized by the Midstream Facilities.   Such fixed fees can be either a burden or benefit to Extraction's real property interests, depending on the status of the market.   *See Alta Mesa*, 613 B.R. at 103 ("[T]he fixed fee arrangements diminish the value of [the producer's] reserves in a depressed hydrocarbon market . . . [but] [i]n favorable market conditions this might benefit [the producer].").   The payment obligation is a covenant running with the land.   *See Badlands Energy*, 608 B.R. at 868; *see also Energytec*, 739 F.3d at 225.

**7.    These covenants touch and concern the land.**

62.    The covenants noted above are closely related to the use and enjoyment of the Dedicated Interests and benefit and burden the Dedicated Interests.  The Court therefore concludes that the covenants in the Gathering Agreements touch and concern the land and that the Gathering Agreements as a whole, as well as the covenants therein, run with the land.

**C.    If privity of estate is required under Colorado law, it is met.**

63.    Extraction argues that Elevation cannot establish privity of estate.  To the extent privity is applicable, "the requisite privity exists in the case of a covenant by a grantor to do or not to do something on land retained by him, adjoining that conveyed, so that one to whom the former is subsequently conveyed by him may be bound by the covenant."  *Taylor*, 274 P.2d at 982 (quotation omitted).

64.    Privity is meant to provide notice.  *See Sabine*, 550 B.R. at 69 ("[T]he underlying purpose of the horizontal privity of estate requirement . . . is to ensure that a covenant that binds successors is formally recorded in connection with the real property that is being burdened by the covenant.").  The Memoranda as to the Gathering Agreements were publicly recorded and provide adequate notice.  *Elevation MSJ* (A. D.I. 12-8, 12-9, 12-10), Ex. 7 and Ex. 8 and Ex. 9.

65.    A covenant that burdens and benefits successors satisfies any privity requirement under Colorado law.  *See Lookout Mountain*, 867 P.2d at 74 (covenants run with the land when they bind successors and assigns).  The Gathering Agreements, including Section 2.4 and Exhibit A, Section XII, are clear that successors and assigns are burdened by the covenants therein.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.4, (Ex. A) § XII and Ex. 2 at § 2.4, (Ex. A) § XII and Ex. 3 at § 2.4, (Ex. A) § XII.

66.    Additionally, privity (even if required) was also created and further demonstrated pursuant to Extraction's granting of easements to Elevation under the Gathering Agreements to

construct and maintain the Midstream Facilities. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XVI(d) and Ex. 2 at (Ex. A) § XVI(d) and Ex. 3 at (Ex. A) § XVI(d). The covenants in the Gathering Agreements adjoin the easements granted to Elevation under the Gathering Agreements and Extraction's real property interests therein and thereunder from which such conveyed easements arose. *See Taylor*, 274 P.2d at 982. Under Colorado law, "[a]n easement is an interest in property." *Wright*, 697 P.2d at 387. The granting of an easement for surface use is a conveyance of a property interest tied to the oil and gas leases, not the surface estate. *See Frankfurt Oil*, 413 P.2d at 194 (indicating Colorado oil and gas leases include the right to use the surface land as necessary for operation). And while an easement is "a privilege existing distinct from the ownership of the land itself; nevertheless it is an interest in land." *Strole*, 37 P.3d at 533. As "a surface easement is a crucial component of an oil and gas lease," and "integrally tied to the purpose of an oil and gas lease," the granting of an easement "is enough to show horizontal privity." *Alta Mesa*, 613 B.R. at 106.

67.     *Sabine* does not support Extraction's argument that the granting of an easement under the Gathering Agreements fails to create privity. The easements at issue in *Sabine* were merely contemplated, not actually effective or granted by the producer under the gathering agreement at issue there. 547 B.R. at 69. In contrast, the easements in the Gathering Agreements were actually granted by Extraction upon execution of the Gathering Agreements. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XVI(d) and Ex. 2 at (Ex. A) § XVI(d) and Ex. 3 at (Ex. A) § XVI(d). The easements in the Gathering Agreements are therefore sufficient to create horizontal privity.

68.     Finally, the Dedication of the Dedicated Interests under the Gathering Agreements also creates privity. The Dedication applies to the oil, gas, and water in and under the land, as well

as the lands, mineral interests, easements, leases, and wells.  Through the Dedication, Extraction

relinquished to Elevation certain rights under its oil and gas leases, including as to transportation,

and committed the hydrocarbons in the Dedicated Area exclusively to Elevation.  *See Garman*,

886 P.2d at 654.  This granting of a real property interest under the Dedication is therefore

sufficient to create horizontal privity.

69.    Accordingly, even if horizontal privity is a requirement to create covenants running

with the land under Colorado law, that requirement is met here, and the Gathering Agreements,

and the covenants therein, therefore run with the land.

> **D.    The Gathering Agreements are integrated such that if one agreement contains a covenant running with the land then all do.**

70.    Exhibit A, Section XVI(a) of each Gathering Agreement provides that each

Gathering Agreement, along with the other transaction Basic Documents (including the exhibits,

appendices, annexes, and schedules), embody the complete agreement and understanding among

the parties.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. F) § XVI(a) and Ex. 2 at (Ex.

F) § XVI(a) and Ex. 3 at (Ex. F) § XVI(a).  The Gathering Agreements and the other Basic

Documents "taken together, collectively constitute a single, unitary, and indivisible contract."  *Id.*

71.    Because the Gathering Agreements constitute a single, unitary, and indivisible

contract, "all of the contracts that comprise an integrated agreement must either be assumed or

rejected, since they all make up one contract."  *In re Exide Tech.*, 340 B.R. 222, 228 (Bankr. D.

Del. 2006), *aff'd*, 2008 WL 522516 (D. Del. Feb. 27, 2008) ("A contract will not be bifurcated

into parts that will be rejected and those that will not."); *In re Plaza*, 363 B.R. 517, 522 (Bankr.

S.D. Tex. 2007) (holding single, inseverable contract "must be assumed or rejected in its entirety").

72.    All of the underlying agreements between the applicable Debtors, Elevation and/or

GSO are to be read together to incorporate the covenants running with the land.  Even if one of the

Gathering Agreements did not contain covenants running with the land, as integrated contracts, the fact that one agreement contains covenants running with the land requires finding that each of them does. *See In re Buffets Holdings, Inc.*, 387 B.R. 115, 122 (Bankr. D. Del. 2008) (holding where "the parties entered a multi-part contract, that contract cannot be severed after the fact if the parties entered it as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out" (quotation omitted)).  "[U]nder Colorado law, a contract cannot be severed unless the language of the contract manifests each party's intent to treat the contract as divisible." *Univex Int'l, Inc. v. Orix Credit Alliance, Inc.*, 914 P.2d 1355, 1357 (Colo. 1996).  The parties' intent to treat the contract as indivisible here is manifested in the contracts themselves. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. F) § XVI(a) and Ex. 2 at (Ex. F) § XVI(a) and Ex. 3 at (Ex. F) § XVI(a).

73.     Accordingly, the Court finds that the Gathering Agreements are integrated such that they all contain covenants running with the land.

<u>**CONCLUSION**</u>

The Court **DENIES** Extraction's motion for summary judgment and **GRANTS** summary judgment to Elevation on Extraction's declaratory judgment claims. Therefore, the Court **ENTERS** a declaratory judgment that the Gathering Agreements between Extraction and Elevation, and the covenants therein, run with the land.

Dated: October 8, 2020
Wilmington, Delaware

Respectfully submitted,

By: /s/ Amanda R. Steele
     Paul N. Heath (Del. No. 3704)
     Amanda R. Steele (Del. No. 5530)
     Travis J. Cuomo (Del. No. 6501)
     RICHARDS LAYTON & FINGER, P.A.
     One Rodney Square
     920 North King Street
     Wilmington, DE 19801
     Telephone: (302) 651-7700
     Facsimile: (302) 651-7701
     heath@rlf.com
     steele@rlf.com
     cuomo@rlf.com

     -and-

     Marty L. Brimmage, Jr.
     Admitted *pro hac vice*
     Sarah Link Schultz
     Admitted *pro hac vice*
     AKIN GUMP STRAUSS HAUER & FELD LLP
     2300 N Field St, Suite 1800
     Dallas, TX 75201
     Telephone: (214) 969-2800
     Facsimile: (214) 969-4343
     mbrimmage@akingump.com
     sschultz@akingump.com

     *Counsel to the Special Committee of the Board of Directors of Elevation Midstream, LLC and to GSO EM Holdings LP*